UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EDIN MAURICIO MARIN PORTILLO,
Petitioner,

-against-

LAWRENCE CATLETTI, Colonel and Facility Administrator, Orange County Correctional Facility et al.,
Respondents.

26-cv-6374 (AS)

OPINION AND ORDER

ARUN SUBRAMANIAN, United States District Judge:

On September 11, 2026, the Court granted Edin Mauricio Marin Portillo's petition for habeas corpus relief and ordered the Government to release him from custody. Dkt. 30. This opinion supplements the Court's reasons for that decision.

In 2024, Portillo was granted an order of withholding of removal to his home country of Honduras. Dkt. 2 at 7–18. As part of that order, the Immigration Judge ("IJ") found that if Portillo "were to return to Honduras, it is more likely than not that he will be killed or tortured" by a criminal organization "with the consent or acquiescence of Honduran public officials." *Id.* at 18. The IJ credited Portillo's testimony, including his report about a gruesome and tragic incident where his cousin, Eldin, was kidnapped for ransom. After Eldin's mother filed a police report, Eldin's "body was found in a bush, wrapped up and dismembered with a note that said, 'the same thing will happen to the family Marin, the dogs.'" *Id.* at 9.

Since that time, Portillo has been living in the United States without incident, under an order of supervision. *Id.* at 1–2. But in April 2026, the Government, without warning, revoked Portillo's order of supervision and re-detained him. Dkt. 7 at 2. In doing so, the Government issued a notice of revocation of release stating only that "[c]ircumstances have changed such that there is a significant likelihood of removal in the reasonably foreseeable future" to "an alternate country." Dkt. 18-1. The Government acted pursuant to 8 C.F.R. § 241.13(i)(2), which says that an alien's release under an order of supervision may be revoked "if, on account of changed circumstances, the Service determines that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future." Twelve days after he was re-detained, the Government served Portillo with a so-called "notice of removal" identifying the "alternate country" it planned to send him to: Mexico. Dkt. 18-2.

But Portillo wasn't removed to Mexico. Instead, he was detained for months—first in Texas and then in New York—apparently because he refused to sign the notice of removal, which Mexican officials purportedly require before they accept anyone for third-country removal. Dkt. 18

at 2. Why did Portillo refuse to sign the notice? That was the main subject of the September 11, 2026, hearing, which revealed lapses in the Government's decision-making process that warranted the grant of Portillo's petition.

Since the early days of his detention, Portillo has complained that if he were removed to Mexico, he would be sent to Honduras in defiance of the IJ's 2024 order. In his first habeas petition, filed when Portillo was in Texas, he submitted a declaration from his wife, Ana Rivera, who had called the Mexican consulate. *See* Exhibit to Emergency Petition for Writ of Habeas Corpus at 16, *Portillo v. Facility Adm'r*, No. 26 Civ. 542 (S.D. Tex. June 11, 2026), Dkt. 1-2. According to Rivera, she was told that "if Mexico receives a Honduran national sent from the United States, Mexico [will] deport that person back to Honduras." *Id.* So what did the Government do to investigate this possibility? As explained below, the answer is nothing.

In failing to make that inquiry, the Government violated its own required procedures. Under 8 C.F.R. § 241.13(i)(2), before revoking Portillo's release, the Government was required to determine that there were "changed circumstances." Of course, the Government could not have rationally made that determination if sending Portillo to Mexico would have ended with Portillo back in Honduras, where the IJ concluded Portillo would likely be killed or tortured. "Changed circumstances" don't include an indirect route to a destination that an IJ has foreclosed. Indeed, there's a term for this—"indirect" or "chain" refoulment—and even the Government doesn't advance the position that sending someone to a country only for them to be shipped to a prohibited destination is appropriate. Dkt. 44 at 9 [hereinafter Sept. Transcript] (The Court: "[I]f the government were aware that Mr. Portillo would likely be sent by Mexico to Honduras, it would not try to remove Mr. Portillo to Mexico, correct?" The Government: "I would hope not, your Honor."); *Kebede v. Cole*, 2026 WL 2971804, at *4 (S.D. Tex. June 12, 2026) (detailing petitioner's claim of "chain refoulement"); Michelle Foster, *Protection Elsewhere: The Legal Implications of Requiring Refugees to Seek Protection in Another State*, 28 Mich. J. Int'l L. 223, 244–50 (2007) (discussing "the notion of indirect refoulement").

But at the September 11, 2026, hearing, the Government admitted that it had not even *considered* the issue and had no assurances from Mexico that Portillo would not be sent to Honduras by Mexican authorities. *See, e.g.*, Sept. Transcript at 4 (The Court: "[W]hat assurances . . . did ICE have that Mexico would not remove [Portillo] to Honduras?" The Government: "ICE did not have any specific assurances from Mexico.").[1] It also made no effort to investigate the representations that had allegedly been made by the Mexican consular employee to Portillo's wife. *See id.* at 4–5

[1] The morning of the hearing, the Government filed a declaration from a deportation officer (who did not appear to have had anything to do with Portillo's case). Dkt. 28. That declaration stated in conclusory terms that "[b]ased on ICE's experience with third-country removals to Mexico, individuals removed to Mexico are able to freely live in Mexico and are not removed from Mexico to other countries." *Id.* ¶ 11. The declaration was not based on personal knowledge, contained no explanation of the factual basis for this assertion, and did not indicate any consideration of Portillo's specific concerns. Moreover, the declaration was untimely filed, and the declarant didn't attend the hearing to answer questions. Suffice it to say, the declaration is entitled to no weight.

(The Court: "What steps did the [G]overnment take to investigate [the] information" contained in Rivera's declaration? The Government: "None that I am aware of.").

Compounding these deficiencies, the Government deprived Portillo of his right to make his case after being re-detained. The same regulation the Government relied upon to revoke Portillo's release also requires a prompt "informal interview" where "[t]he alien may submit any evidence or information that he or she believes shows there is no significant likelihood he or she [will] be removed in the reasonably foreseeable future," and ensures that the Government's review "will include an evaluation of any contested facts relevant to the revocation and a determination whether the facts as determined warrant revocation and further denial of release." 8 C.F.R. § 241.13(i)(3).

But as the Government conceded at the hearing, Portillo had no opportunity to present evidence at the interview. *See* Sept. Transcript at 9 ("I don't see a way that he could have had documentary evidence for this interview."). In fact, at the time of the interview, the government hadn't even told Portillo it was planning to send him to Mexico. *See* Dkt. 18 at 1–2 (detailing that the informal interview took place on April 22, whereas he was served with the notice of removal on May 4); *Youboty v. Mullin*, 2026 WL 2169059, at *3 (E.D. Pa. July 28, 2026) ("[A]lthough revocation under § 241.13 may be based on changed circumstances, the informal interview must present a meaningful chance to respond to the Government's reasons for revocation."). And while the Government did later furnish Portillo with a fear-screening interview, Dkt. 24-2, there is no indication that Portillo's concerns about being shipped to Honduras by Mexican authorities were considered. *See* Sept. Transcript at 4, 11–12. Indeed, despite the IJ's 2024 order, there is nothing in the report by the interviewer—who, like the IJ, found Portillo credible—indicating that they considered the possibility that Portillo would be sent to Honduras from Mexico, other than a note recording Portillo's expressed fear that this is what would occur. *See* Dkt. 24-2; Sept. Transcript at 11–12.

To lawfully detain Portillo, the Government was required to "act pursuant to its statutory authority, in compliance with its own regulations, and consistent with the United States Constitution." *Diallo v. Joyce*, 817 F. Supp. 3d 202, 204 (S.D.N.Y. 2025); *see Montilla v. I.N.S.*, 926 F.2d 162, 167 (2d Cir. 1991) ("[W]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures." (quoting *Morton v. Ruiz*, 415 U.S. 199, 235 (1974))). Here, in its haste to try to remove Portillo, the Government failed to act in compliance with its own regulation and required procedures.

An IJ found that Portillo would likely be tortured or killed in Honduras, and the judge blocked his removal to that country. On any view of what "changed circumstances" means, the Government was required to consider whether sending Portillo to Mexico might end up with Mexican officials sending him to Honduras and determine for itself that this would not happen. *See Vang v. Bondi*, 2026 WL 458195, at *3 (D. Minn. Feb. 18, 2026) ("The government detained the petitioner first, and asked questions later. That's not how this works."); *cf. Mbaba v. Perez*, 2026 WL 917484, at *9 (S.D. Tex. Feb. 13, 2026) ("Due process requires the Government to answer whether Ms. Mbaba specifically faces possible torture or persecution in Equatorial Guinea, including whether removal to Equatorial Guinea would result in 'chain refoulement' to her home country of Mauri-

tania."). It made no effort to do that. Having no other basis for revoking Portillo's order of supervision, the Government acted unlawfully. *See Ndoye v. Joyce*, 2026 WL 306387, at *7–8 (S.D.N.Y. Feb. 5, 2026) (granting habeas relief where "ICE improperly revoked Petitioner's [order of supervision] and failed to follow its own regulations"); *Alvarez v. Catletti*, 2026 WL 2607671, at *5 (S.D.N.Y. Sept. 3, 2026) ("Because ICE failed to follow its own regulations in revoking Alvarez's [order of supervision], Respondents violated Alvarez's due process rights.").

This leaves the question of remedy. Here, the sole justification for Portillo's detention was his potential removal to Mexico. Having violated its own regulation in detaining him on this ground, the "typical remedy" for "unlawful executive detention," *i.e.*, release, is appropriate. *Munaf v. Geren*, 553 U.S. 674, 693 (2008); *see Diallo*, 817 F. Supp. 3d at 210. The Government does not suggest otherwise.

To be clear, nothing in this order prevents the Government from attempting to remove Portillo in the future, even to a third country. "But the way we treat others matters. Disregarding the law—not to mention common human decency—in the way the government has done in this case, exacts a severe human and societal toll, to say nothing of the tremendous economic burden on the American taxpayer, who foots the bill for the needless and indeterminate incarceration of people like [Portillo]." *Diallo*, 817 F. Supp. 3d at 210.

**CONCLUSION**

For these reasons, and those set forth on the record at the September 11, 2026, hearing, Portillo's petition for habeas corpus relief is GRANTED. The Clerk of Court is respectfully requested to enter judgment for petitioner and to close the case.

SO ORDERED.

Dated: October 7, 2026
New York, New York

ARUN SUBRAMANIAN
United States District Judge